IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CI OAKHURST, a California Limited Liability Company, | ) ) ) | 8:13CV340 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| COMMERCIAL STATE BANK OF WAUSA, a Nebraska banking corporation, | ) ) ) ) | |
| Defendant. | ) ) | |

This is a diversity action in which Plaintiff, CI Oakhurst, seeks to recover loan payments that it made to Defendant, Commercial State Bank of Wausa ("Bank") over a period of 4 years in the allegedly mistaken belief that it had assumed the obligations of the loan debtor, Roaster Ranch, Inc., and purchased real property that secured the loans.[1] Bank counterclaims to recover the balance owing on the loans.[2]

The parties have filed cross-motions for summary judgment (Filings 52, 56).[3] Bank's motion only addresses CI Oakhurst's claim, while CI Oakhurst's motion

---

[1] CI Oakhurst alleges in its amended complaint (Filing 23) that Bank has converted $245,862.59 in loan payments.

[2] Bank counterclaims (Filing 25) to recover $95,407.93, plus interest, based on theories of breach of contract (successor liability) and breach of implied contract. Bank also asserts a right to setoff against any damages CI Oakhurst may recover, based on theories of quasi-contract (unjust enrichment) and tortious interference with contract or business relationship.

[3] Bank has also filed a motion (Filing 49) to restrict access to certain of tax return documents which are filed as exhibits in support of its motion for summary judgment. The motion will be granted.

involves the entire action. For the reasons discussed below, Bank's motion will be granted and CI Oakhurst's motion will be granted in part and denied in part.

*Standard of Review*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering summary judgment motions, the burden of demonstrating there are no genuine issues of material fact rests on the moving party, and the court reviews the evidence and inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party. *See Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 680 (8th Cir. 2012). However, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).

"A mere scintilla of evidence is insufficient to defeat summary judgment and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (internal quotation marks and citations omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

*Uncontroverted Facts*

As required by the court's local rules, Bank's supporting brief (Filing 53, at 3-8) includes a 28-paragraph "statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to

-2-

judgment as a matter of law." NECivR 56.1(a)(1).[4] CI Oakhurst's opposing brief (Filing 60, at 1-8) includes an appropriate response to each paragraph. *See* NECivR 56.1(b)(1).[5] Similarly, CI Oakhurst's brief filed in support of its motion for summary judgment (Filing 57, at 2-4) contains a 19-paragraph statement of material facts, and the Bank's opposing brief contains an appropriate response (Filing 59, at 2-10). Upon review of the briefs and referenced materials,[6] the court finds there is no genuine dispute regarding the following facts:

1. CI Oakhurst is a California limited liability company with its principal place of business in Watsonville, California. [Plaintiff's Statement of Facts ("PSF"), ¶ 1.]

_____

[4] "The statement of facts should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph. A fact is "material" if pertinent to the outcome of the issues identified in the summary judgment motion. The statement of facts must describe the parties and recite all facts supporting the court's venue and jurisdiction. The statement must not contain legal conclusions. <u>Failure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion.</u>" NECivR 56.1(a)(2) (underlining in original).

[5] "The party opposing a summary judgment motion must include in its brief a concise response to the moving party's statement of material facts. Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>" NECivR 56.1(b)(1) (underlining in original).

[6] Unless expressly admitted by the opposing party, statements which are not supported by the referenced materials, or which are conclusions of law, or which contain inadmissible evidence, are not included. However, some statements have been modified by the court to conform to the evidence; some erroneous citations to the record have also been corrected.

2. Bank is a Nebraska banking corporation with its principal place of business in Wausa, Nebraska. [PSF, ¶ 2.]

3. In approximately 2005, CI Oakhurst purchased one parcel of real property in the State of Missouri from Roaster Ranch, Inc., a Nevada corporation (Ex. 5 [Filing 58-5], Purchase Agreement, Bates Nos. 0001-0015). [PSF, ¶ 3.][7]

4. CI Oakhurst leased equipment and loaned money to Roaster Ranch (Ex. 2 [Filing 58-2], Galtelli Dec. at ¶9). [PSF, ¶ 6.]

5. On March 17, 2006, Roaster Ranch signed and delivered to Bank a note, disclosure, and security agreement in the original principal amount of $195,000.00 (the "March Note") (Ex. A, [Filing 54-1, at 7] authenticated at Ex. 1 [Filing 54-1, at 1], Claussen Aff. ¶ 3). [Defendant's Statement of Facts ("DSF"), ¶ 1.][8]

---

[7] CI Oakhurst claims "the Missouri parcel is the only real property CI Oakhurst purchased from Roaster Ranch" (citing Ex. 8 [Filing 58-8], at 4, CI Oakhurst's Second Supplemental Answer to Interrogatory No. 6; Ex. 9 [Filing 58-9], at 2, CI Oakhurst's First Amended Responses to Requests For Admission Nos. 4-5). [PSF, ¶5.] Bank disputes this statement by responding that "CI Oakhurst's federal tax returns indicate that it purchased several parcels of real property from Roaster Ranch, including but not necessarily limited to real property in Battle Creek, Madison County, Nebraska, and Randolph, Cedar County, Nebraska" (citing Filing 54-2, Ex. 4, Pl's Response to Request for Production No. 14, authenticated at Ex. 5 [Filing 54-3], ¶ 3 and Filing 55, portions of Pl's 2007, 2008, and 2010-2012 federal tax returns, authenticated at Ex. 5 [Filing 54-3], ¶ 3. The court finds there is a genuine dispute regarding Oakhurst's interest, if any, in the Madison County and Cedar County real property.

[8] CI Oakhurst admits paragraphs 1-10 of Bank's statement of facts, but objects that any facts regarding "loan transactions between Bank and Roaster Ranch are irrelevant because neither Plaintiff nor its related business entities executed an agreement with Roaster Ranch to be responsible for any of its indebtedness to the Bank. (Ex. 5 [Filing 58-5], Fischer Declaration at ¶¶ 8-9)." (Filing 60, at 1.) CI Oakhurst's relevancy objections to paragraphs 1-10 are overruled.

6. The March Note was modified from time to time by two loan extension agreements (the "March Extension Agreements") (Ex. 1 [Filing 54-1, at 1], ¶ 3; Ex. K [Filing 54-1, at 92], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 18). [DSF, ¶ 1.]

7. On April 21, 2006, Roaster Ranch signed and delivered to Bank a note, disclosure, and security agreement in the original principal amount of $190,000.00 (the "April Note") (Ex. B [Filing 54-1, at 10], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 4). [DSF, ¶ 2.]

8. The April Note was modified from time to time by two loan extension agreements (the "April Extension Agreements") (Ex. 1 [Filing 54-1, at 1], ¶ 4; Ex. K [Filing 54-1], at 92). [DSF, ¶ 2.]

9. On July 16, 2006, Roaster Ranch signed and delivered to Bank a note, disclosure, and security agreement in the original principal amount of $25,000.00 (the "July Note," and together with the March Note and the April Note, the "Notes") (Ex. C [Filing 54-1, at 12], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 5). [DSF, ¶ 3.]

10. The July Note was modified from time to time by two loan extension agreements (the "July Extension Agreements," and together with the March Extension Agreements and the April Extension Agreements, the "Extension Agreements") (Ex. 1 [Filing 54-1, at 1], ¶ 5; Ex. K [Filing 54-1, at 92]). [DSF, ¶ 3.]

11. To secure payment of the indebtedness due pursuant to some or all of the Notes, on or about March 17, 2006, Roaster Ranch signed and delivered to Bank a deed of trust (the "Cedar County Deed of Trust") granting Bank a lien on certain real property owned by Roaster Ranch in Cedar County, Nebraska, as more fully described therein (the "Cedar County Real Property"). [DSF, ¶ 4.]

12. The Cedar County Deed of Trust was duly recorded on March 24, 2006, in the office of the Recorder of Cedar County, Nebraska, at Book 249, Page 92 (Ex. D [Filing 54-1, at 14], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 6). [DSF, ¶ 4.]

13. To secure payment of the indebtedness due pursuant to some or all of the Notes, on or about April 21, 2006, Roaster Ranch signed and delivered to the Bank a deed of trust (the "Madison County Deed of Trust") granting Bank a lien on certain real property owned by Roaster Ranch in Madison County, Nebraska, as more fully described therein (the "Madison County Real Property", and together with the Cedar County Real Property, the "Real Property").  [DSF, ¶ 5.]

14. The Madison County Deed of Trust was duly recorded on May 1, 2006, in the office of the Recorder of Madison County, Nebraska, at Doc. 2006-05, Page 56 (Ex. E [Filing 54-1, at 23], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 7). [DSF, ¶ 5.]

15. From April 2006 to approximately December 2007, Roaster Ranch paid the Bank the total amount of $114,750.00 pursuant to the Notes. (Ex. F1-F3 [Filing 54-1, at 32], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 8). [DSF, ¶ 6.]

16. On or around February 2007, Roaster Ranch defaulted on its obligations owed to Bank pursuant to the Notes by failing to pay the Notes as required. (Ex. 1 [Filing 54-1, at 1], ¶ 9). [DSF, ¶ 7.]

17. Because of Roaster Ranch's defaults, in August 2007, Bank began the non-judicial foreclosure process pursuant to both the Cedar County Deed of Trust and the Madison County Deed of Trust (Ex. 1 [Filing 54-1, at 1], ¶ 10). [DSF, ¶ 8.]

18. On September 6, 2007, Bank informed Jon Willers, President of Roaster Ranch, that it would halt the foreclosure process upon receipt of payment in the amount of $19,980.00 (Ex. G [Filing 54-1, at 44], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 11). [DSF, ¶ 9.]

-6-

19. On September 7, 2007, YMG made a payment of $19,980.00, which Bank credited against the Roaster Ranch debt, and which halted Bank's foreclosure (Ex. H [Filing 54-1, at 45], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 12). [DSF, ¶ 10.]

20. From September 7, 2007 through October 9, 2008, Bank received $86,060.00 in payments from YMG (Ex. I [Filing 54-1, at 50], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 14). [DSF, ¶ 11; *see also* PSF, ¶ 7.]

21. From December 8, 2008 through September 13, 2011, Bank received $177,279.90 in payments from CI Oakhurst (Ex. J [Filing 54-1, at 60], authenticated at Ex. 1 [Filing 54-1, at 1], ¶ 15). [DSF, ¶ 12; *see also* PSF, ¶ 8.]

22. Bank credited all payments it received from CI Oakhurst and YMG against Roaster Ranch's debt owed to Bank (Ex. 1 [Filing 54-1, at 1], ¶ 16). [DSF, ¶ 13.][9]

23. So long as Bank was receiving payments from Roaster Ranch, YMG, and/or CI Oakhurst, Bank forbore from exercising its rights to foreclose on the Real Property pursuant to the Cedar County Deed of Trust and Madison County Deed of Trust (Ex. 1 [Filing 54-1, at 1], ¶ 22). [DSF, ¶ 14.]

24. The following amounts are still owed to Bank pursuant to the Notes: (a) Principal amount of $95,407.93; (b) Accrued interest of $12,015.00 as of May 1, 2014; (c) Accruing per diem interest of $17.25 (Ex. 1 [Filing 54-1, at 1], ¶17). [DSF, ¶ 15.][10]

---

[9] A portion of the $177,279.90 that CI Oakhurst paid to Bank was applied to insurance (Filing 54-1, Ex. I). [PSF, ¶ 11.]

[10] CI Oakhurst admits paragraph 15 of Bank's statement of facts but objects that it is irrelevant. (Filing 60, at 4.) This objection is overruled.

25. CI Oakhurst believed it purchased Roaster Ranch and assumed Roaster Ranch's obligations owed to Bank (Filing 28, ¶¶ 4, 18, Pl.'s Answer). [DSF, ¶ 16.]

26. CI Oakhurst subsequently determined that it had not purchased Roaster Ranch, but, rather, believed it had purchased the Real Property from Roaster Ranch (Filing 23, ¶ 5, Amended Complaint). [DSF, ¶ 17 (modified).]

27. It was not until recently – in its Second Supplemental Answers to Interrogatories – that CI Oakhurst changed its belief once again, and now asserts that it did not even purchase the Real Property from Roaster Ranch (Ex. 2 [Filing 54-2, at 1], at 3-4, Pl.'s Second Supplemental Answers to Interrog. No. 6, authenticated at Ex. 5 [Filing 54-3], ¶3; Ex. 3 [Filing 54-2, at 9], at 2-3, Pl.'s First Amended Response to Requests for Admission Nos. 4-5, authenticated at Ex. 5 [Filing 54-3], ¶3). [DSF, ¶ 18.][11]

28. Although CI Oakhurst now asserts it did not purchase Roaster Ranch or the Real Property, CI Oakhurst identified the Real Property and related assets on its federal tax returns for years 2007, 2008, and 2010 through 2012,[12] and claimed depreciation expenses based on those assets. (Ex. 4 [Filing 54-2, at 13], Pl's Response to Request for Production No. 14 and portions of Pl's 2007, 2008, and 2010-2012 federal tax returns, authenticated at Ex. 5 [Filing 54-3], ¶3).[DSF, ¶ 19.]

––––––––––––––––––

[11] CI Oakhurst admits paragraph 18 of Bank's statement of facts but states that its "relationship with Roaster Ranch appears to be limited to having loaned money and leased equipment to Roaster Ranch. (Ex. 2 [Filing 58-2], Galtelli Declaration at ¶9; Ex. 5 [Filing 60-5], Fischer Declaration at ¶¶6, 10)." (Filing 60, at 5.)

[12] CI Oakhurst did not produce a copy of its depreciation expense schedule for tax year 2009 during discovery.

29. CI Oakhurst was aware that if payments were not being made to Bank under the Notes, Bank had the right to proceed with foreclosure of the Real Property (Ex. 3 [Filing 54-2, at 9], at 3, Nos. 8-9). [DSF, ¶ 20.][13]

30. At the time Bank received the September 7, 2007 payment from YMG, Bank had never solicited any payment from YMG and/or CI Oakhurst, nor was Bank aware of the exact relationship between Roaster Ranch, YMG, and CI Oakhurst (Ex. 1 [Filing 54-1, at 1], ¶ 13). [DSF, ¶ 21.]

31. CI Oakhurst does not and cannot identify any action on the part of Bank allegedly inducing CI Oakhurst's mistake. [DSF, ¶ 22.][14]

32. Roger R. Claussen, Nebraska City Branch President of Bank, prepared the Extension Agreements to be executed by its borrower, Roaster Ranch (Ex. 1 [Filing 54-1, at 1], ¶¶ 18, 19). [DSF, ¶ 23.]

33. The first Extension Agreements were not prepared and sent until September 2010, or three years after YMG and/or CI Oakhurst first began making payments on the Roaster Ranch Notes (Ex. 1 [Filing 54-1, at 1], ¶¶ 19, 14). [DSF, ¶ 24.]

34. Gerald Fischer, principal of YMG and CI Oakhurst, signed the Extension Agreements, purportedly on behalf of Roaster Ranch (Filing 23, ¶ 9, Amended

---

[13] CI Oakhurst admits paragraph 20 of Bank's statement of facts but objects that it is irrelevant. (Filing 60, at 5.) This objection is overruled.

[14] CI Oakhurst objects that this statement is irrelevant. (Filing 60, at 6.) This objection is overruled.

Complaint; Ex. 1 [Filing 54-1, at 1], ¶ 20; Ex. K [Filing 54-1, at 92]). [DSF, ¶ 25 (modified); *see also* PSF, ¶ 9.][15]

35. Once CI Oakhurst notified Bank that it believed the payments were made by mistake, Bank stopped all collection efforts towards Mr. Fischer and CI Oakhurst (Filing 23, ¶ 13, Amended Complaint; Ex. 2 [Filing 54-2, at 1], at 2, No. 4), although it now asserts in counterclaims that CI Oakhurst is liable for the balance of Roaster Ranch's indebtedness. [DSF, ¶ 28 (modified); *see also* PSF, ¶¶ 12-13.]

36. Bank admits that it has no written documentation, including notes, security agreements, guaranties, or other similar loan documents, wherein CI Oakhurst agreed to be liable to Bank upon Roaster Ranch Notes. (Ex. 3 [Filing 58-3], Bank's Supplemental Answer to Interrogatory No. 14). [PSF, ¶¶ 14, 18.]

37. Likewise, Bank denies any communications, oral or written, between its employees, officers, and agents and CI Oakhurst relating or referring to whether CI Oakhurst would become liable to the Bank upon Roaster Ranch Notes. (Ex. 4 [Filing 58-4, at 13], Bank's Answers to Interrogatory Nos. 4-7). [PSF, ¶ 15.]

38. CI Oakhurst's accounting department is located within a sister company, Sterling Pacific Lending, which acts as a loan servicer and, for lack of a better term, "go-between" between CI Oakhurst, its related entities, and its borrowers and/or lenders. [PSF, ¶ 19.][16]

---

[15] CI Oakhurst admits Gerald Fischer signed the Extension Agreements, but denies he had authority to act or sign on behalf of Roaster Ranch (citing Ex. 5 [Filing 60-5], Fischer Declaration, ¶13). (Filing 60, at 7.)

[16] Bank admits paragraph 19 of CI Oakhurst's statement of facts but objects that it it irrelevant. (Filing 59, at 10.) This objection is overruled.

39. This accounting department is not tasked with the duty of making further inquiry into the validity, timeliness, or propriety of any such requests or demands for payment on loans and would simply make such payments in the ordinary course (Ex. 2 [Filing 58-2], ¶18). [PSF, ¶ 19.]

*CI Oakhurst's Claim*

"As a general rule, payment under a mistake of fact, which the payor was under no legal obligation to make, may be recovered back." *U.S. Fidelity & Guar. Co. v. First Nat. Bank*, 260 N.W. 798, 802 (Neb. 1935); *see also Billings v. McCoy*, 5 Neb. 187, 1876 WL 4489, *2 (Neb. 1876) ("A voluntary payment ... made under a mistake as to *facts*, may be recovered back in an action for money had and received. It is not necessary, to authorize a recovery in a case like this, that the mistake should have been caused by the wrongful act of the defendant.") (emphasis in original); Restatement (Third) of Restitution and Unjust Enrichment ("Restatement") § 6 ("Payment by mistake gives the payor a claim in restitution against the recipient to the extent payment was not due."). However, as noted in the Restatement, "[t]he recipient of a mistaken payment may have one of several affirmative defenses to liability in restitution, notably the defense of change of position (§ 65) and the defense allowed to a bona fide payee (§ 67)." Restatement § 6, cmt. a.

Bank in this case relies upon the bona fide payee defense, which is "analogous to the defense given a purchaser of other property for value without notice" (*i.e.*, a bona fide purchaser). Restatement § 67, cmt. a. Thus, the Restatement provides:

(1) A payee without notice takes payment free of a restitution claim to which it would otherwise be subject, but only to the extent that

(a) the payee accepts the funds in satisfaction or reduction of the payee's valid claim as creditor of the payor or of another person;

-11-

(b) the payee's receipt of the funds reduces the amount of the payee's claim pursuant to an obligation or instrument that the payee has previously acquired for value and without notice of any infirmity; or

(c) the payee's receipt of the funds reduces the amount of the payee's inchoate claim in restitution against the payor or another person.

(2) A payee is entitled to the defense described in this section only if payment becomes final, and the payee learns of the payment and its ostensible application, before the payee has notice of the facts underlying the restitution claim the defense would cut off. For purposes of this subsection, a payment becomes final when the payor is no longer entitled to countermand or recover it without the aid of legal process.

Restatement § 67.

This defense was expressly recognized by the Nebraska Supreme Court in *Federated Mut. Ins. Co. v. Good Samaritan Hospital*, 214 N.W.2d 493 (Neb. 1974), in considering whether an insurer could recover an overpayment from a hospital that was the result of the insurer's own mistake. The insurer's policy capped its insured's benefits at $12,047.30, but it paid the hospital a total of $19,822.78 on behalf of its insured. The hospital had rendered services to the insured in the amount of $13,915.20. When the insurer later requested that the hospital refund the payment exceeding policy limits, the hospital refunded only $5,816.31. The insurer filed suit to recover the additional $1,959.17 that had been applied to the insured's hospital bill but was in excess of the insured's policy limits. There was no dispute that the insurer made the mistake or that the hospital had acted in good faith and without knowledge of the mistake when it received payment. The court found for the hospital, holding that "[a] creditor who has innocently received payment of a debt from a third party is under no duty to make restitution to the third party if it is later discovered that the third party had no responsibility to make the payment and payment was made solely

-12-

because of the third party's mistake." *Id.*, at 496.[17] The hospital "was not required to show a change of position in reliance and to its detriment, because it was in the position of a bona fide purchaser for value." *Id.*, at 495.

The bona fide payee defense was subsequently mentioned (but not applied) by the Nebraska Supreme Court in *Wendell's, Inc. v. Malmkar*, 405 N.W.2d 562, 569 (Neb. 1987). More recently, in *Abante, LLC v. Premier Fighter, L.L.C.*, 836 N.W.2d 374 (Neb.App. 2013), involving an action in assumpsit for money had and received, the Nebraska Court of Appeals held that a retailer which had accepted wire transfers from a third party in satisfaction of an outstanding debt was entitled to retain the funds even though the payments were made because of the debtor's fraudulent misrepresentations regarding the purpose of the payments (the payor was falsely informed that the payments would be used for the production of merchandise). The court found that the payee did not have knowledge of the fraud and had acted in good faith as an innocent party, and was therefore entitled to summary judgment in its favor. *Id.*, at 376. Noting that "[r]estitution is predominantly the law of unjust enrichment," *id.*, at 379, the court determined that the payee "presented evidence to show that it was not unjustly enriched by retaining this money, and [the payor] has failed to adduce evidence to show the existence of a genuine issue of material fact."

---

[17] The Nebraska Supreme Court relied upon the original Restatement's Section 14(1) ("Discharge for Value"), which, as stated in the opinion, provided that "[a] creditor of another or one having a lien on another's property who has received from a third person any benefit in discharge of the debt or lien, is under no duty to make restitution therefor, although the discharge was given by mistake of the transferor as to his interests or duties, if the transferee made no misrepresentation and did not have notice of the transferor's mistake." *Federated*, 214 N.W.2d at 495; Restatement of Restitution, § 14(1) (1937). "The thought behind the expression 'discharge for value' is that the protected recipient of a payment is treated as a bona fide purchaser of the money, to the extent the payee gives value by accepting the payment in discharge of an antecedent debt." Restatement § 67, cmt. a. The current version of the Restatement "adopts different terminology to make the rule easier to understand, and it states the rule more broadly." *Id.*

In reaching this result, the court specifically referenced Restatement § 63(1)(a), *see* 836 N.W.2d at 379, and relied heavily upon the *Federated* decision, including a finding therein that "the hospital had not been unjustly enriched because it had retained only the amount it was due for the services performed," *id.*, at 381.

The *Federated* and *Abante* decisions are controlling here. Bank has produced evidence to show that it has not been unjustly enriched by the payments it received from CI Oakhurst,[18] because those payments were applied against Roaster Ranch's outstanding indebtedness, and there is no evidence to show that Bank knew or should have known that Roaster Ranch and its property holdings had not been acquired by CI Oakhurst. There also is no evidence to show that Bank induced CI Oakhurst to make the payments in any way. Because the undisputed evidence establishes that the Bank innocently received payments from CI Oakhurst and in good faith applied the payments to Roaster Ranch's antecedent indebtedness, Bank's motion for summary judgment will be granted, CI Oakhurst's cross-motion for summary judgment on its claim against Bank will be denied, and CI Oakhurst's claim will be dismissed with prejudice. As stated by the Nebraska Supreme Court in the *Federated* decision, "[s]omeone must suffer the loss, and as between [CI Oakhurst] and [Bank], the party making the mistake should bear that loss." 214 N.W.2d at 496.[19]

Although CI Oakhurst contends the court's partial denial of the Bank's previously filed Rule 12(b)(6) motion [*see* Memorandum and Order entered March 31, 2014 (Filing 19)] requires a different result, the bona fide payee defense was not at issue then, nor should the Bank have been expected to raise the issue when not all

---

[18] Although Bank contends that YMG and CI Oakhurst are separate entities, and that CI Oakhurst cannot sue to recover payments made by YMG, it is not necessary to resolve this issue before granting Bank's motion for summary judgment since it does not affect the result.

[19] "The *Federated* case left open the right of the payor ... against ... the debtor." *Wendell's*, 405 N.W.2d at 569.

of the facts which are essential to the defense had been alleged in the complaint.  CI Oakhurst argues that the law of the case doctrine should apply, but even if the court's earlier memorandum and order decided legal issues in a manner inconsistent with the instant opinion,[20] that doctrine applies only to issues decided by final judgments, not to a ruling on a motion to dismiss. *See Lovett v. General Motors Corp.*, 975 F.2d 518, 522 (8th Cir. 1992) (also stating that "[w]hen a district court is convinced that it incorrectly decided a legal question in an interlocutory ruling, the district court may correct the decision to avoid later reversal.").

### *Bank's Counterclaims*

CI Oakhurst has moved for summary judgment on Bank's counterclaims which seek to recover the balance owing on Roaster Ranch's loans and assert a right to setoff.  CI Oakhurst argues that the counterclaims are not supported by any evidence and are barred by the statute of frauds. Bank responds that there are genuine issues of material fact and that the statute of frauds does not apply.

### *Count I. "Breach of Contract – Successor Liability"*

For Count I of it counterclaims, Bank alleges:

> 18. According to CI Oakhurst's complaint herein against Bank, CI Oakhurst acquired and/or believed it acquired Roaster Ranch, and assumed all liabilities owed by Roaster Ranch.

> 19. One individual – Jerry Fischer – controlled both CI Oakhurst and Roaster Ranch. In particular, Jerry Fischer, who CI Oakhurst asserts is its principal, signed the Loan Extension Agreements on behalf of Roaster Ranch.

---

[20] The court does not believe there is any such inconsistency.

-15-

20. CI Oakhurst and Roaster Ranch commingle and transfer property among each other. In particular, Roaster Ranch transferred the Cedar County Real Property and Madison County Real Property to CI Oakhurst for little or no consideration.

21. CI Oakhurst is the successor and/or alter ego of Roaster Ranch. To the extent CI Oakhurst took ownership of the Cedar County Real Property and Madison County Real Property and now asserts that Bank was not entitled to receive loan payments to be applied to Roaster Ranch's obligations owed to Bank, the transfer of the Cedar County Real Property and Madison County Real Property was an effort to shield assets from Roaster Ranch's creditors.

22. CI Oakhurst is Roaster Ranch's successor in interest. As such, CI Oakhurst's and Roaster Ranch's status as separate corporate entities should be disregarded, and CI Oakhurst should be held liable for Roaster Ranch's obligations owed to Bank.

(Filing 25, at 6-7.)

Bank argues "[t]here is contradictory evidence regarding whether or not Oakhurst purchased Roaster Ranch and/or its Nebraska property." (Filing 59, at 14.) Bank's evidence consists of two items: (1) CI Oakhurst's answer in which it "admits that Jerry Fischer, the principal of CI Oakhurst and CI Oakhurst's manager Yosemite Management Group, signed loan extension cards/memos at the request of Bank, which included the name of Roaster Ranch on said cards, believing at the time that CI Oakhurst had purchased Roaster Ranch and assumed its loans, although CI Oakhurst did not in fact purchase Roaster Ranch or assume its obligations" (Filing 28, ¶ 6); and (2) "the fact that Oakhurst's filed federal tax returns ... show that Oakhurst claimed depreciation expenses based on assets it purchased from Roaster Ranch in Nebraska." (Filing 59, at 15). According to Bank, this evidence indicates that "Oakhurst either purchased Roaster Ranch, or it purchased the Nebraska assets from Roaster Ranch." (*Id.*) But even if it may be assumed that one of these events happened, it does not follow that CI Oakhurst is liable for Roaster Ranch's indebtedness.

-16-

Bank's "alter ego" theory of liability assumes that Roaster Ranch retained its separate corporate identity after allegedly being acquired by CI Oakhurst. However, Bank has presented no evidence to support its allegations that "CI Oakhurst and Roaster Ranch commingle and transfer property among each other," that "Roaster Ranch transferred the Cedar County Real Property and Madison County Real Property to CI Oakhurst for little or no consideration," or that "the transfer of the Cedar County Real Property and Madison County Real Property was an effort to shield assets from Roaster Ranch's creditors." This claim therefore fails as a matter of law.

Bank's alternative theory is that CI Oakhurst acquired Roaster Ranch's Nebraska assets. However, it is the general rule that even when a corporation sells all of its assets, the purchaser is not liable for the debts of the seller. *Village Builders 96, L.P. v. U.S. Laboratories, Inc.*, 112 P.3d 1082, 1087 (Nev. 2005). There are four well recognized exceptions to the general rule: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction is really a consolidation or a merger; (3) when the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction was fraudulently made in order to escape liability for such debts. *Id.*; *Ray v. Alad Corp.*, 560 P.2d 3, 7 (Cal. 1977); *Earl v. Priority Key Services, Inc.*, 441 N.W.2d 610, 613 (Neb. 1989).[21] Because Bank has failed to produce sufficient evidence to show that any of these exceptions applies, Count I will be dismissed with prejudice.

*2. Count II. "Breach of Implied Contract"*

For Count II of it counterclaims, Bank alleges:

25. CI Oakhurst took ownership of the Cedar County Real Property and Madison County Real Property subject to Bank's liens.

---

[21] Because the law is the same in Nevada, California, and Nebraska, there is no need to need to resolve any choice of law issue regarding successor liability.

26. CI Oakhurst and Bank had an implied contract whereby CI Oakhurst would continue to make payments to Bank pursuant to the Notes, and Bank would forego exercising its right to foreclose on the Cedar County Real Property and Madison County Real Property.

27. CI Oakhurst partially performed its obligations pursuant to its implied contract; however, CI Oakhurst failed and refused to pay all amounts owed to Bank pursuant to the Notes.

(Filing 25, at 7-8.)

"An implied contract arises where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract." *Linscott v. Shasteen*, 847 N.W.2d 283, 289 (Neb. 2014) (citing *City of Scottsbluff v. Waste Connections of Neb.*, 809 N.W.2d 725 (Neb. 2011); *Turner v. Fehrs Neb. Tractor & Equip.*, 609 N.W.2d 652 (Neb. 2000)). "Evidence of facts and circumstances, together with the words of the parties used at the time, from which reasonable persons in conducting the ordinary affairs of business, but with special reference to the particular matter on hand, would be justified in inferring such a contract or promise, is sufficient." *Id.* (citing *Woods v. Woods*, 129 N.W.2d 519 (Neb. 1964)). "The determination of the parties' intent to make a contract is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction." *Id.*, at 289-90 (citing *Kaiser v. Millard Lumber*, 587 N.W.2d 875 (Neb. 1999)).

There is no evidence that CI Oakhurst and the Bank reached any agreement. Indeed, when asked about this "implied contract" claim in interrogatories, Bank did not claim to have had any communications with CI Oakhurst. Bank merely responded that it "had commenced non-judicial foreclosure against Cedar County Real Property and Madison County Real Property in the year 2007 due to non-payment of the obligations secured by the real estate," that "Yosemite Management Group ("YMG"), unsolicited by Bank, delivered the required payment to cure the default," and that "[f]rom that point forward, YMG and/or Plaintiff made loan payments to Bank, and

Bank did not proceed with foreclosure." (Filing 58-4, at 10). Count II will also be dismissed with prejudice for lack of evidence.

*Count III. "Quasi-Contract and Unjust Enrichment"*

For Count III of its counterclaims, Bank alleges:

31. CI Oakhurst took ownership of the Cedar County Real Property and Madison County Real Property subject to Bank's liens.

32. In order to prevent Bank from exercising its legal right to foreclose on the Cedar County Real Property and Madison County Real Property, CI Oakhurst implicitly-atlaw promised to make the payments owed to Bank pursuant to the Notes and secured by the Cedar County Real Property and Madison County Real Property.

33. Bank relied on CI Oakhurst's implied-at-law promise, and refrained from foreclosing on the Cedar County Real Property and Madison County Real Property so long as Bank received payments to be applied to the Notes.

34. Allowing CI Oakhurst to own the Cedar County Real Property and Madison County Real Property without paying Bank is unjust and inequitable.

35. Bank has no adequate remedy at law if CI Oakhurst is found not obligated to have made payments to Bank.

36. It would be inequitable and unconscionable to permit CI Oakhurst to own the Cedar County Real Property and Madison County Real Property without any party making payments to Bank pursuant to the Notes secured by said property.

37. In the event Bank is found obligated to repay CI Oakhurst any amount pursuant to a judgment arising from CI Oakhurst's complaint herein, CI Oakhurst is being unjustly enriched at Bank's expense because Bank forewent from exercising its rights to realize on its

collateral as a result of CI Oakhurst's implied-at-law promise to make payments.

38. Bank is entitled to a setoff of any damages awarded to CI Oakhurst, if any, in order to prevent CI Oakhurst from being unjustly enriched at Bank's expense.

(Filing 25, at 8-9.)

 "[A] claim that a court should imply a promise or obligation to prevent unjust enrichment is sometimes referred to as an 'implied-in-law contract' or a 'quasi-contract.'" *Waste Connections*, 809 N.W.2d at 738. "The defendant's liability arises under the law of restitution, not contract." *Id.* "Unjust enrichment requires restitution, which measures the remedy by the gain obtained by the defendant, and seeks disgorgement of that gain." *Trieweiler v. Sears*, 689 N.W.2d 807, 834 (Neb. 2004) (citation omitted). Because Count III as alleged by the Bank requires an adverse finding that CI Oakhurst is "not obligated to have made payments to Bank," and that Bank is "obligated to repay CI Oakhurst"(Filing 25, ¶¶ 35, 37), it is mooted by the court's favorable ruling and will be dismissed without prejudice.

*Count IV. "Tortious Interference with Contract and/or Business Relationship"*

Finally, for Count IV of its counterclaims, Bank alleges:

40. Bank had a valid business relationship and/or contracts with Roaster Ranch pursuant the Notes, Loan Extension Agreements, Cedar County Deed of Trust, Madison County deed of Trust, and possibly other loan documents.

41. CI Oakhurst knew of the business relationship and/or contracts between Bank and Roaster Ranch.

42. CI Oakhurst unjustifiably and intentionally interfered with Bank's and Roaster Ranch's business relationships and/or contracts by taking ownership of the collateral securing Roaster Ranch's obligations

-20-

owed to Bank but paying little or no consideration for such collateral, thereby inducing Roaster Ranch to breach its contractual obligations to Bank.

      43. CI Oakhurst now asserts it is entitled to recover the amounts it paid to Bank that were applied to the Notes. Any amount Bank is found obligated to pay, if any, to CI Oakhurst pursuant to a judgment arising from CI Oakhurst's complaint herein shall constitute damages to Bank that arise solely out of CI Oakhurst's interference with Bank's and Roaster Ranch's business relationships and/or contracts.

(Filing 25, at 8-9.)

As with Count III, this claim depends upon "Bank [being] found obligated to pay ... CI Oakhurst pursuant to a judgment arising from CI Oakhurst's complaint ...." (*Id.*, ¶ 43.) Because the court has found in favor of Bank on CI Oakhurst's complaint, this claim will be dismissed without prejudice, as moot.

Accordingly,

IT IS ORDERED:

1.    Defendant's motion to restrict access to documents (Filing 49) is granted, and, pursuant to NECivR 5.3(c), access to Filing 55 shall be restricted to attorneys of record and court users.

2.    Defendant's motion for summary judgment (Filing 52) is granted, and Plaintiff's complaint is dismissed with prejudice.

3.    Plaintiff's motion for summary judgment (Filing 56) is granted in part and denied in part, as follows:

a.    The motion is granted with respect to Count I and Count II of Defendant's counterclaims, and they are dismissed with prejudice.

b.    Count III and Count IV of Defendant's counterclaims are dismissed without prejudice, as moot.

c.    The motion is denied with respect to Plaintiff's complaint.

4.    Judgment shall be entered by separate document.

DATED this 6th day of February, 2015.

                                    BY THE COURT:

                                    s/ Richard G. Kopf
                                    Senior United States District Judge

---

        * This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.